UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

UNITED STATES OF AMERICA,

        -against-                              98 CR 290-01 (CM)

JOSE M. SANTIAGO,

                          Defendant.

———————————————————— x

## DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR A SENTENCING REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

McMahon, J.:

    On March 31, 1995, Jose Santiago broke into a one-bedroom basement apartment in Yonkers, New York and shot and killed Efraim Torres in the presence of Torres's wife and two small children.

    On March 10, 2000, after the Government had noticed its intent to pursue a death sentence, Santiago pleaded guilty, pursuant to a plea agreement with the Government, to Conspiracy To Murder In Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count 1); Murder In Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count 2); and Use, Carrying, and Possession of a Firearm, in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3).

    On April 26, 2000, the Court sentenced Santiago to a term of imprisonment of 50 years, acquiescing to the plea agreement Santiago entered into with the Government.[1]

---

[1] "The parties agree, pursuant to Rule ll(e)(1)(C), that a specific sentence of a term of imprisonment of fifty (50) years (600 months) is the appropriate disposition of this case. Pursuant to Rule ll(e)(2) the Court may accept or reject this Agreement or may defer its decision as to the acceptance or rejection of this Agreement until the Court

Before the Court is Santiago's motion for a sentence reduction under 18 U.S.C. §
3582(c)(1)(A), comprised of an initial *pro se* filing dated July 11, 2022, and four supplemental
filings by counsel (1) a memorandum in support of release, filed on July 19, 2024, (2) a reply
memorandum to the Government's opposition papers, filed January 17, 1995, (3) a supplemental
letter filed January 21, 2025, and (4) a supplemental letter filed March 11, 2025. The *pro se*
submission from the defendant requests a sentence reduction principally based on defendant's
contention that *Miller v. Alabama*, 567 U.S. 460 (2012), provides an extraordinary and
compelling reason for a sentence reduction given the defendant's age at the time of the instant
offense and the length of his sentence of 50 years' imprisonment. (ECF No. 238 at 4, 7-9). The
counseled submissions develop the age and length of sentence arguments and asks the Court to
find that (1) together they constitute extraordinary and compelling reasons for a sentence
reduction, under the "catch-all" provision of U.S.S.G. § 1B1.13(b)(5), and that (2) defendant's
release would be consistent the sentencing factors at Section 3553(a). (ECF No. 272,
(Defendant's Sealed Memo at 32-54). Santiago asks the Court to reduce his sentence to 30 years'
imprisonment. *Id*. at 54.

The Government asks that the Court deny defendant's request for a sentence reduction
(1) for his failure to exhaust his administrative remedies within the Bureau of Prisons, (2) the
absence of "extraordinary and compelling" reasons warranting a reduction, as required by 18
U.S.C. § 3582(c)(1)(A), and (3) because the sentencing factors set forth in 18 U.S.C. § 3553(a),
counsel against a reduction.

has had the opportunity to consider the presentence report. However, should the Court reject this Agreement or
impose a sentence other than a term of fifty (50) years' imprisonment, this Agreement is voidable by either party."
Plea Agreement, 98-cr-290-CM, Doc. 274-2. The Court, reluctant to sentence the shooter in this ruthless murder to
anything less than life in prison, nonetheless acceded to the parties' agreement and sentenced Santiago to 50 years.

2

## A Senseless Murder and Its Prosecution

Since Santiago's motion contemplates reducing his sentence for committing a horrendous crime, it is important that the Court recount for the reader—in some detail—the circumstances of this long-ago murder. It is a pathetic tale of a group of impoverished, rudderless, mostly-young men, who found meaning and structure in their otherwise bleak lives through membership in the Latin King street gang. In mindless adherence to the gang's perverse code, these young men engaged in all manner of antisocial behavior, including murder.

### *The Fight Between Two Teenage Girls Escalates Out of Control*

On March 17, 1995, in Yonkers, New York, Idania Garcia, a/k/a "Queen Cuddles," a Latin Queen (and then girlfriend of Jose Santiago, a/k/a "King Monkey"), had an argument with another teenaged girl who lived in her Yonkers neighborhood. Garcia told Yonkers First Crown Hector Colon, a/k/a "King Hector," about the argument. He, in turn, went to confront the girl with whom Garcia had had the altercation. As Colon argued with the girl outside her apartment building, her father, Alek Rosario, came to his daughter's defense. A heated argument then broke out between Colon and Rosario. (Tr. 692, 802-04, 1435-38).

Efraim Torres was present on the Yonkers sidewalk when the fight between Alek Rosario and Hector Colon erupted. Watching the argument escalate, Torres started to take off his jacket. This caught the attention of Colon, who shouted at Torres, "You gonna do something?" Torres replied, "Maybe." Colon then struck Torres, while Torres still was in the process of removing his coat. Defending himself, Torres stabbed Colon with a sharp object. Colon ran from the scene shouting, "Get me a gun, get me a gun!" (Tr. 692-94).

3

*The Planned Retaliation*

Following the stabbing, Colon went to a local hospital, where, referring to Torres, he told Manuel Perez, a/k/a "King Apache," "Yo, promise me that you're gonna get that motherfucker." (Tr. 524). Meanwhile, the Yonkers Latin Kings, under the supervision of the State Supremas—as well as the Ambassador, defendant Angel Luis Lugo, a/k/a "King Bear"—gathered to plan retaliation. (Tr. 186-88, 805). Perez went to Colon's residence, where the other Latin Kings were assembled, and commenced an investigation into the details of the stabbing. Perez was then the Third Supreme Crown, or War Lord, of the New York Latin Kings and, as such, was responsible for deciding the appropriate retaliation. (Tr. 524-27). In the presence of defendant Lugo, Perez questioned Idania Garcia, a/k/a "Queen Cuddles," about the argument that led to the incident. (Tr. 1439). Perez also spoke with defendant Alejandro, who said that he could show Perez where the incident had occurred. (Tr. 525-26). At approximately 2 a.m. defendant Alejandro brought Perez to the apartment of Alek Rosario, where they questioned Rosario about the fight. Perez and Alejandro then returned to Colon's residence, where they reported to Lugo that they had not learned anything helpful to Colon's cause. Lugo replied, "This shit has to be taken care of." (Tr. 526-28).

In the days following the fight between Colon and Torres, the Latin Kings called a series of emergency meetings to discuss retaliation. (Tr. 290, 294, 299-301, 821-22, 825-27, 1439). At an emergency meeting, Jose Santiago, a/k/a "King Monkey," volunteered to shoot Torres, because the argument that led to the stabbing involved his girlfriend, Idania Garcia, a/k/a "Queen Cuddles." (Tr. 205, 807). The Yonkers Latin Kings reported their progress to Colon and Angel Luis Lugo, a/k/a "King Bear." Lugo pressured them to retaliate quickly and expressed his dissatisfaction that it was taking them so long. (Tr. 825-26). The Yonkers Latin Kings

4

understood that they had to retaliate quickly against Torres in order to prove to the Latin Kings leadership that they were a credible chapter. (Tr. 76, 188-90, 826, 838-39).

### The Stalking of Alek Rosario

In the days following the initial fight, the entire Yonkers chapter of the Latin Kings, staked out a four-block radius surrounding Alek Rosario's residence, looking for Rosario, the person who had originally quarreled with Colon. The Latin Kings leaders had ordered the Yonkers Latin Kings to beat Rosario until he told them who Torres was and where Torres lived. (Tr. 808).

A day or two after the stabbing incident, Alek Rosario and his daughter saw a group of Latin Kings approaching their residence. Frightened, Rosario and his daughter climbed out the back window of their apartment building, climbed over a fence and left town. They never returned to their apartment and they never recovered their personal belongings from the apartment. (Tr. 699).

The Yonkers Latin Kings never found Rosario or his daughter and stopped staking out the apartment when they learned that Rosario had left town. (Tr. 809).

### The Murder Weapon

Colon ordered Edgar Pacheco, a/k/a "King Blue Eyes," Juan Fontanez, a/k/a "King Smurf," and defendant Angel Alejandro, a/k/a "King Vamp," to go to the Bronx to obtain a gun. In the presence of defendant Angel Luis Lugo, a/k/a "King Bear," Colon asked Banny Melendez, an associate of the Yonkers Latin Kings who worked as a cab driver, to drive a group of Latin Kings to the Bronx and back. Melendez drove defendant Alejandro and the others to the Bronx, where they obtained a nine-millimeter gun from Manuel Perez, a/k/a "King Apache." (Tr. 198-99, 711-13, 814).

5

*The First Attempt*

Once they obtained the nine-millimeter gun, the Yonkers Latin Kings started formulating a plan to kill Torres. They learned that Torres' mother lived a few blocks from where Torres was employed, and they decided to assemble at a location from which they could observe both locations and to shoot Torres on sight. (Tr. 817-18).

Raul Rivera, a/k/a King Chap, took the gun home with him and met up with his fellow gang members in the early morning hours, around 4 a.m. Pursuant to the plan, Jose Santiago, a/k/a "King Monkey," the designated shooter, was stationed with the gun at a location proximate to both Torres' place of employment and Torres' family residence. The other gang members combed the adjacent blocks looking for Torres. Nobody spotted him, so the murder squad aborted the plan and split up at around 8 a.m., due to early morning vehicle and pedestrian traffic. (Tr. 817-21).

*The Second Attempt*

The next attempt to kill Torres occurred a few days later. Daniel Berrios, a/k/a "King Danny" reported to the Latin Kings that he personally knew the Torres family. Berrios volunteered to approach the family and attempt to lure Torres out of the family residence so that he could be killed. Accordingly, Berrios and Edgar Pacheco, a/k/a "King Blue Eyes," armed with the nine-millimeter gun, went to the residence of Iris Andino, Torres' mother. Berrios spoke to Mrs. Andino at her door, with one arm behind his back. He told her that he was a friend of her son and asked her about her grandson, whom he called by his nickname. Ms. Andino knew that the Latin Kings were looking for her son, so she lied and told Berrios that she did not know where her son was staying. As Berrios left with Pacheco, Ms. Andino saw that they had a gun. (Tr. 194-96, 822-23, 1200-01).

6

*The Continuing Pressure*

Throughout the days following the stabbing, the state leadership of the Latin Kings, particularly defendant Lugo, kept constant pressure on the Yonkers chapter to retaliate against Torres for injuring Colon. The Yonkers Latin Kings called numerous emergency meetings of the entire chapter, at which they had to explain and justify their failure to kill Torres. Prior to the stabbing, Lugo had rarely come to Yonkers; after the stabbing of Colon, however, he was there almost daily, questioning Juan Fontanez, a/k/a "King Smurf," and others about the progress they were making in killing Torres. Lugo told the Yonkers Latin Kings that if they were unable to take care of their own business, he would have to bring in the Bronx chapter to do the job. (Tr. 76, 188-90, 188, 806-07, 825-27, 838-39).

Meanwhile, Efraim Torres knew that the Latin Kings were combing the neighborhood looking for him. At first, he hid in his mother's residence. Several days later, he moved to the basement apartment of his friend Tony Santos, on Elliott Avenue in Yonkers. Torres, his wife and two children hid in the apartment, where Santos lived with his wife and six small children. In order to alter his appearance, Torres shaved his head and beard. (Tr. 1621-23).

*The Murder*

On March 31, 1995 Hector Colon arrived at the block in Yonkers where the Latin Kings regularly assembled and told the gang members that he had found Efraim Torres hiding in a basement apartment on Elliott Avenue. Colon ordered the Yonkers Latin Kings to immediately go and kill Torres. In accordance with Latin Kings protocol, the Latin Kings looked for their Warlord and Third Crown, Juan Fontanez, a/k/a "King Smurf," to dispatch a death squad. Fontanez, however, was not in the neighborhood. Colon therefore appointed defendant Raul Rivera as Acting Warlord. In his capacity as Acting Warlord, Rivera selected defendants Berrios

7

and Alejandro, as well as Pacheco and Santiago, to kill Torres. Alejandro rode his bicycle and accompanied the other members of the death squad who walked to Elliott Avenue. Meanwhile, back at the Latin Kings' neighborhood block, Fontanez arrived and was told by Rivera that Rivera had been appointed Acting Warlord, that he had dispatched the death squad, and that he had given Santiago the murder weapon. (Tr. 77, 204-211, 829-31).

When the Latin Kings arrived at the Elliott Avenue building, they were approached by a person they knew as "Tony." They told Tony that they knew that Torres was hiding in the residence, and demanded that Torres come out so that they could speak to him. Tony went into the Elliott Avenue multi-family residence, but the Latin Kings team got anxious because he remained in the residence for what they perceived as too long a period of time. (Tr. 208-09).

The death squad formulated a plan of attack. They decided that Pacheco would guard the outer front door of the building, while Santiago and defendant Berrios went into the apartment. Alejandro was instructed to circle the surrounding area on his bicycle, to look out for signs of police activity. As Santiago and Berrios entered the Elliott Avenue residence Berrios told Santiago, "I hope that you do not freeze— I've seen that happen before." (Tr. 209-10).

As planned, Berrios and Santiago entered the building, Santiago going immediately to the basement apartment and pushing in the apartment door. After Santiago burst into the apartment, Torres's wife Katherine Mielke, who was pregnant with their third child, came out of the bathroom and was confronted by Santiago, who was waiving a gun in her face. Katherine begged Santiago not to shoot her husband and allow her to remove her two small children from the living room. Instead, she and the children, who were seated on the living room sofa, saw Santiago shoot Torres at close range. Torres fell to the ground after the first shot, bleeding

8

profusely, and then Santiago stood over the body and fired an additional shot.  Torres died quickly, just feet away from his wife and children. (Tr. 1625-26; 1200).

Torres died from two gunshot wounds.  One bullet passed though Torres' neck, fracturing his spine and cutting off his ability to support his bodily functions.  The other bullet passed through his shoulder.  (Tr. 450-56).  In the apartment, the police recovered two bullets and one shell casing, both from the same nine-millimeter weapon. (Tr. 1603; GX 500, 501, 502).

Immediately after the shooting, the death squad ran from the Elliott Avenue residence and returned to their neighborhood block *via* separate routes.  (Tr. 213, 831-32).

As the death squad returned to the block, one by one they reported their success to Fontanez, the Warlord and Third Crown, and several other Latin Kings leaders, including Colon and Lugo.  Later that evening, the Latin Kings leaders issued a "black rose," or gag order, on the incident, and ordered Santiago and Pacheco to return the murder weapon to Manuel Perez, a/k/a "King Apache" in the Bronx.  (Tr. 221-23, 832-37).

*Santiago is Arrested and the Rest Follow*

On November 20, 1997, Santiago was arrested and initially charged by criminal complaint, before a series of superseding indictments were voted against him and his Latin Kings codefendants who played a part in the murder of Efraim Torres.  On February 4, 2000, the Government filed a notice of intent to seek the death penalty, having obtained authorization from the Capital Section of the Department of Justice.

After learning of the Government's intent to pursue the death penalty, on March 10, 2000, Santiago entered a guilty plea pursuant to a plea offer from the Government, which was made pursuant to the predecessor to current Federal Rule of Criminal Procedure 11(c)(1)(C). Pursuant to the plea offer, the parties stipulated, and the Court agreed, to imposition of a

9

sentence of 50 years' imprisonment and five years' supervised release. In his plea allocution before the Court, the defendant stated, "I'm a member of the Latin Kings and . . . I went . . . to kill Efraim Torres." (03/10/2000 Tr. 20:17-19). After the Court asked, "And did you, in fact, kill Efraim Torres?" the defendant replied, "Yes, I did." And after the Court asked in turn, "And did you do that with a nine[-]millimeter gun . . . as part of and in furtherance of the mission of the Latin Kings . . . [and] to help [ ] maintain or solidify your position within the Latin Kings," to each question the defendant replied, "I did." (03/10/2000 Tr. 20:20-21:10).

On April 26, 2000, the Court sentenced the defendant to the promised sentence of 50 years' imprisonment.[2]

### Compassionate Release

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

---

[2] The trial of defendants Berrios, Rivera, Lugo and Alejandro commenced on July 10, 2000, and concluded on August 3, 2000, when the jury found all defendants guilty of conspiracy to murder and the murder of Efraim Torres in aid of racketeering.   On December 14, 2000, the Court sentenced all four defendants to life in prison.

If a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). However, any reduction of a defendant's sentence must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582 (c) (1) (A). Here, Santiago argues that granting him early release would be consistent with the Other Reasons policy Statement (the so called "catch all" provision, § 1B1.13(b)(5)) that recognizes a court's authority to find an extraordinary and compelling reason for relief if the "defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)," § 1B1.13(b)(5). Def Amended Mot. at 29-30.

Finally, neither the recent amendment to the Guidelines nor *Brooker* changed the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must also consider the sentencing factors at 18 U.S.C. § 3553(a), to the extent they remain applicable, and determine whether they counsel for or against release. A court always retains discretion to deny a motion for compassionate release if, in its view, the § 3553(a) factors override what would otherwise present extraordinary and compelling circumstances for release.

<u>Santiago Has Exhausted his Administrative Remedies in the Bureau of Prisons</u>

Santiago says that on March 25, 2021, he submitted an email to the warden of USP Hazelton requesting a reduction in his sentence under the First Step Act. Santiago says that he never received a response. *See* Dkt. 238, at 3-4. The Government says that it found no evidence

11

that defendant ever emailed the warden and asks the Court to reject his proffer of having

exhausted his remedies with the BOP.

However, the Court need not rely on Santiago's purported email to the warden to find

that he has exhausted his administrative remedies. On April 29, 2024, in what counsel says was

an "abundance of caution," counsel submitted a request for First Step Act relief to the warden of

Santiago's current facility, FCI Gilmer. Ex. QQ. Counsel argued that the BOP should move for a

sentence reduction on Mr. Santiago's behalf based on, *inter alia*, his age at the time of his

offenses, the long time he has already served, and his extraordinary rehabilitation in prison. *Id.*

And Counsel represents that the BOP has never responded to his request.

Accordingly, the Court finds that Santiago has exhausted his administrative remedies

with the Bureau of Prisons.

<u>The Motion Before the District Court</u>

Santiago argues that a sentence reduction is warranted based on a combination of factors:

his young age when he committed his crimes (19 years old), the horrific abuse he suffered up to

that time, his extraordinary rehabilitation and remorse, his service to others, his unusually long

prison sentence, and the dire conditions of confinement that he has endured over the past 27

years.

Santiago asks the Court to revisit the 50-years sentence it imposed on him 27 years ago,

in light of scientific studies that have demonstrated that "increases in criminal and other

behavioral problems during adolescence are due, in great part, to the neurological and

psychosocial immaturity that mark this developmental period. Across adolescence, there are

distinct changes in brain development and developmental change in psychosocial processes that

appear to make youths susceptible to becoming involved in criminal behavior and reckless

behavior more generally." Def Amend Mtn at 33-34, citing, Kathryn Monahan, Laurence Steinberg, Alex R. Piquero, *Juvenile Justice Policy and Practice: A Developmental Perspective*, 44 Crime & Just. 577, 580 (2015). Teenagers specifically are attracted to "criminal activity particularly with peers, at a time when they lack the judgment to exercise self-control and to consider the future consequences of their behavior." *Id.* at 588 (internal citation omitted).

Santiago's legal argument is not a novel one. More than a decade ago, the Supreme Court noted, in *Miller v. Alabama*, that accepted scientific and social science studies have explained that there is a fundamental difference between the minds of youths and adults, and such findings "of transient rashness, proclivity for risk, and inability to assess consequences" lessen a young person's "moral culpability" and enhance "the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed.'" 567 U.S. at 471-73 (citations omitted). And the Second Circuit, in *United States v. Delgado*, 971 F.3d 144, 158 (2d Cir. 2020), clarified that: "*Miller* requires the district court to undertake additional reflection on the special social, psychological, and biological factors attributable to youth." *Id.*

With the passage of the First Step Act, defendants who were long ago sentenced to life in prison (or decades long prison sentences tantamount to life sentences) now have a legal avenue to ask their sentencing courts to reconsider their sentences in-light-of *Miller*. Courts have been varyingly receptive to such motions, occasionally finding that defendant's youth at the time of his crime, combined with other factors such as a difficult upbringing, and rehabilitation, constituted extraordinary and compelling reasons to reduce the defendant's sentence. *See, e.g.*, *United States v. DeJesus*, No. 6 Cr. 12 (ER), 2022 WL 1154251, at *1, *5-*8 (S.D.N.Y. Apr. 19, 2022) (granting a sentence reduction for a defendant who played a "major role" in a drug trafficking organization, had a difficult upbringing, and was 19 years

13

old at the time of his crimes); *United States v. Ramsay*, 538 F. Supp. 3d 407, 424-25
(S.D.N.Y. 2021) (granting a sentence reduction based on extraordinary and compelling factors
including the defendant's youth at the time of his crimes, difficult upbringing, and
rehabilitation, where the defendant, at age 17, had followed a gang leader's orders to shoot a
rival gang leader, ultimately killing two innocent bystanders); *United States v. Cruz*, No. 94
Cr. 112 (JCH), 2021 WL 1326851, at *1 (D. Conn. Apr. 9, 2021) (granting a sentence
reduction to a defendant who joined the Latin Kings at age 15 and committed two murders at
age 18, based on his age at the time of the crimes, the length of his sentence, his "truly
exceptional" rehabilitation, and family circumstances, including his mother's health); *United
States v. Robles*, 553 F. Supp. 3d 172, 178-86 (S.D.N.Y. 2021) (granting a sentence reduction,
subject to the defendant exhausting administrative remedies, where the court found
extraordinary and compelling reasons to reduce the 32-year mandatory minimum sentence
imposed for robberies the defendant committed at age 23); *United Statesv. Glynn*, No. 06 Cr.
580 (JSR), 2022 WL 562652, at *8 (S.D.N.Y. Feb. 24, 2022) (granting sentence reduction to a
defendant who was a gang leader and for seven years participated in a drug trafficking
organization that distributed hundreds of grams of crack cocaine, and who had been convicted
at trial of murder in aid of racketeering, narcotics conspiracy, and use of a firearm, based on
his difficult upbringing, youth at the time of the crimes, health concerns, and
rehabilitation);*United States v. Millan*, No. 91 Cr. 685 (LAP), 2020 WL 1674058, at *8
(S.D.N.Y. Apr. 6, 2020) (granting a sentence reduction to a defendant convicted at trial of
participating in a conspiracy to distribute heroin in the 1980s and 1990s based on
extraordinary and compelling reasons, including that the defendant was "no longer the
immature and irresponsible young man who committed his offenses in his early 20s").

14

This Court has on two occasions granted a sentencing reduction motion based, in part, on the defendant's young age at the time of the crime. The first, *United States v. Ramirez*, 571 F. Supp. 3d 40, 52 (S.D.N.Y. 2021), involved a compassionate release motion similar to Santiago's motion. Ramirez was sentenced by the late Honorable Robert W. Sweet for his role as a leader in a criminal organization that distributed drugs and committed several violent acts, including being involved in two murders. *Id.* Ramirez argued that he should be resentenced to time served—the 23 years he had served up to the filing of his motion—and released from custody because of: (1) the COVID-19 pandemic and the possibility that—in light of his medical conditions—he is at risk of suffering serious illness if infected; (2) the harsh conditions of confinement created by the COVID-19 pandemic; (3) his young age at the time he committed his crimes; (4) his extraordinary rehabilitation, and (5) the mandatory nature of the Sentencing Guidelines at the time of sentencing, which required Judge Sweet to reluctantly sentence Ramirez at the statutory maximum of 48 years' imprisonment. At sentencing, Judge Sweet criticized the structure of the drug trafficking laws and indicated that the Court would have granted a downward departure if it had discretion to do so.

> This sentence is a tragedy. You are going to spend your adult life in jail. If I were in a position to do it, I would downwardly depart, but I don't feel under all the circumstances that I can exercise my own beliefs and persuasions contrary to the dictates of the legislation and Congress. I guess what I will do is send the minutes of this proceeding to both judiciary committees in the hope that some way, somehow someone will recognize the human tragedy... I [impose the sentence] with much regret and a heavy heart. I can only say it's very difficult to look forward to the next ... some 40 years, and say I hope something good comes out of it for you personally. Maybe you can figure out some way to make it make sense. I can't.

*See* Sentencing Transcript at 6-7.

This Court reduced Ramirez's sentence from 48 years to 40 years principally because

15

Judge Sweet was bound by mandatory sentencing guidelines at the time of sentence, and because Judge Sweet had strongly expressed a belief that the sentence should be lower based on Ramirez's youth, upbringing, and rehabilitation while incarcerated. 571 F. Supp. 3d at 52. While I agreed to posthumously vindicate Judge Sweet's deeply held conviction that Ramirez's sentence was unjustly long, I was not prepared to reduce Ramirez's sentence to time served: "While this may not reflect the downward departure Judge Sweet contemplated, it is as far as this Court is prepared to go. Notwithstanding Ramirez's dreadful upbringing, his young age when he committed his crimes, and rehabilitation, forty years in prison is as low as this Court will go for this twice murderer." *Id.*

The other instance where this Court reduced a defendant's sentence based, principally, on the defendant's age at the time of the offense was, as it turns out, on a motion by one of Santiago's codefendants, Angel Alejandro. On December 14, 2000, Alejandro was sentence to life in prison (the then mandatory Guidelines sentence) for his role in the murder of Efraim Torres— a role that entailed Alejandro riding his sting-ray bicycle around the block where the murder was to take place "looking-out" for any police activity. His appeal from his conviction was denied by the Second Circuit, and his subsequent motion to vacate his sentence, pursuant to 28 U.S.C. § 2255, was denied by this Court. But in 2014, Alejandro filed a second/successive motion to vacate his sentence pursuant to 28 U.S.C. § 2255, seeking resentencing pursuant to *Miller v. Alabama*, 132 S. Ct. 2455 (2012). In *Miller*, the Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violated the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Id*. at 2455. Although *Miller* does not prohibit a sentence of life without the possibility of parole for a juvenile offender, it mandates that a sentencing judge must be able to at least consider mitigating factors when

16

determining whether such a punishment is appropriate. *Id.* at 2466. Since Alejandro was 15 at the time of the Torres murder, the Government conceded that Alejandro's motion should be granted, and that he should be resentenced to determine whether a life sentence or some other sentence is appropriate in light of the Supreme Court's decision.

Accepting that *Miller* all but required the Court to reduce Alejandro's sentence for his role in Torres murder, the Court ultimately resentenced Alejandro to 300 months' (25 years).

> I have concluded that I'm going to follow probation's recommendation, which of course represents a variance, but the guidelines submission here is still life. And almost anything is a variance. It is a variance that is virtually mandated by *Miller* and the role that Mr. Alejandro played in this offense. It is a variance that is justified by his last few years of incarceration, the maturity that that has lent him. . . . And it is a variance that strikes me as consistent with all of the factors set forth in Section 3553 of Title 18 of the United States Code, all of which, I hasten to add, I have considered. It will strike the defendant's supporters as too much and it will strike the family of Efraim Torres as too little. But that is what I mean when I say there really isn't anything like justice that can be done. There is only a best guess about what the right number is for the retributive portion, the retributive aspect of justice, which is for this Court in connection with this crime the overriding goal of sentencing.

(Doc. 203, Alejandro Resent Transcript at 19-20).

Alejandro's resentencing required the Court to revisit one of the most troubling cases to ever reach its docket. Notably, and particularly relevant here, in deciding how much time to resentence Alejandro, the Court compared Alejandro's role in the offense (a 15 years-old lookout), for which he received a sentence of life, with that of Santiago (a 19 years-old who shot Torres at point blank range in front of Torres' wife and children), for which—by virtue of a plea deal—he received a sentence of 50 years:

17

> I've never been able to forget this case. And I have seen a
> dozen gang cases since. But there was something about this,
> a couple of teenaged girls scratching and pulling each other's
> hair over a silly thing, that that should cause a grown man,
> Hector Colon, to order a murder, of a guy whose only crime
> was to try to stop it, and for that murder to be carried out by
> teenagers and adults who adhered to the disgusting and
> despicable code of the almighty Latin Kings. It really was an
> unforgettable crime, an unforgettable trial. And for a very
> long time, I was most upset about the fact that I was not
> able to sentence the shooter [Santiago] to life imprisonment
> because he was smarter than the rest of them, the actual
> murderer. Never forgot him. And he took a plea. So, he's
> doing 50 years.

*Id*. at 14. Unlike Judge Sweet, who was truly distressed about sentencing Ramirez to 48 years in prison (too harsh), this Court's misgiving about the sentence it imposed on Santiago ran in the opposite direction (too lenient).

It is now 2025, and I still have not forgotten Santiago— his cold-blooded crime, the inadequacy of his sentence. Nothing in Santiago's present motion—not the arguments in his *pro se* motion, nor any argument in his counseled filings, whether considered individually or collectively—establish an extraordinary and compelling reason to reduce his sentence: not his relative young age when he committed the murder (an adult, but only 19); the length of his sentence (long, but hardly inappropriate for an assassin); the fact that he had a horrendous upbringing (awful, but no excuse for his appalling crime); the threat from contracting COVID-19 (COVID-19 is no longer the threat it once was given the development of vaccines and treatments to combat the virus); the harsh conditions he had to endure during the pandemic (unfortunate, but conditions he and every other prisoner incarcerated during that period had to endure); nor his demonstrated rehabilitation.

18

After reflecting anew on "the special social, psychological, and biological factors attributable to youth" *see United States v. Delgado*, 971 F.3d at 158, the Court is not moved to reduce Santiago's bargained for sentence. Santiago's youth and tragic abuse was part of the record when the parties and the Court all agreed at sentencing that a sentence of 50 years' imprisonment was the minimum sufficient to achieve the purposes of sentencing. (*See* Def.'s 07/19/2024 Mot. at 5-7 (citing to Presentence Investigation Report dated March 29, 2000)). It is tragically the case that many, many young men and women in this city suffer great depravation and equal abuse during their childhoods, but the overwhelming majority of them do not go on to become criminals, let alone assassins.

The Court acknowledges that Santiago's claimed rehabilitation appears genuine— notwithstanding his 18 disciplinary violations, some serious, during the first third of his incarceration. The Court accepts his representation that ,"I am not an active member of Latin kings, I am not a leader of Latin kings, I am not in any way form or fashion in dealings with Latin kings. I am an inactive retired Latin king (and have been so since 2012 to present day)." Def Reply Exh 2 at 3. The Court also acknowledges Santiago's apparent efforts to help other inmates to break away from their crippling gang affiliations. And so, the Court need not decide the factual dispute between the Government and defendant regarding the meaning of two prison emails— one from November 26, 2021, and another from August 9, 2024, which the Government says demonstrates that  Santiago "remains every bit a dedicated leader of the Latin Kings," but which  defendant says "demonstrates the exact opposite," and would be prepared to demonstrate to the Court at a hearing. Since the Court is crediting Santiago's claim of rehabilitation (which includes his turning his back on the ways of the Latin Kings), the emails interpretation dispute is moot; there is no need for a hearing.  However, in the absence of other compelling reasons in favor of release, Santiago's

19

rehabilitation alone is an insufficient basis to grant release. *See United States v. Brooker, 976 F.3d 228, 238 (2d Cir. 2020)* (rehabilitation alone shall not be considered an extraordinary and compelling reasons for release).

Moreover, even if Santiago had met his threshold burden of demonstrating an "extraordinary and compelling" reason to be considered for compassionate release, the sentencing factors at 18 U.S.C. § 3553(a)—which the Court must consider in connection with a motion for a sentence reduction, *see* 18 U.S.C. § 3582(c)(1)(A)—counsel against a sentence reduction. Principal among those considerations in this case are "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(1), (2) (A).

Santiago argues that a sentence reduction would be consistent with § 3553(a) factors. He claims that he has "forever been deterred and no longer represents a danger to the community." While Santiago might no longer pose a risk to the community if he were released—and might even add value to the community by counseling at risk young people away from gang affiliation—his early release would seriously undermine the retributive aspect of justice, which, for this Court, in connection with this crime, is the overriding goal of sentencing. (*See* Doc. 203, Alejandro Resent Transcript at 20). Santiago's crime destroyed many lives. As Efraim Torres sister explained at Alejandro's resentencing:

> Your Honor, I want to speak today of how this horrible crime has affected my life and my family's life. I will try to make it as brief as I can. It was the way they hunt him down, the way it affected this family, after shooting him like he was an animal in front of his children and wife. And they were supposed to do the whole family. All these years I lived in fear. I had the children, which are -- I need to

speak one of them for the first time, in all these years that
this horrible thing happened, because the mother kept them
away from everything. She hides them. They changed their
names, everything.  We lived in fear. When people asked
us what our name is, we don't even want to talk to people.
When there's a family reunion and there's pictures, my kids
never put a foot in that funeral parlor. And they ask Why?
What happened? I never had the chance to tell my kids
what really happened. It affected my sister. My mother is
not the happy woman that we always knew. My mom lived
day by day, week by week, month by month, in a cemetery,
talking to a grave.  My mom lost him. She still hasn't
accepted.

(*See* Doc. 203, Alejandro Resentencing Transcript at 19-20).

Santiago got a break from the Court at his original sentencing when the Court agreed to

honor the plea agreement and sentenced him to 50 years in prison. The Court still believes that he

deserves to spend his life in prison.

The motion for compassionate release is denied.

Dated: April 8, 2025

_____
United States District Court Judge

21